**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JOSE LOUIS RODRIGUEZ** | **CIVIL ACTION** |
| **VERSUS** | **NO: 23-7344** |
| **TANGIPAHOA PARISH JAIL, ET AL.** | **SECTION: "H"** |

## ORDER AND REASONS

Before the Court is Defendants Daniel Edwards and Heath Martin's Motion for Partial Summary Judgment (Doc. 55). For the following reasons, Defendants' Motion is **GRANTED**.

## BACKGROUND

This case arises out of Plaintiff Jose Louis Rodriguez's alleged unlawful arrest and detention at Tangipahoa Parish Jail.[1] On January 6, 2023, Plaintiff was arrested by deputies with the Tangipahoa Sheriff's Office related to alleged stolen property. On January 9, 2023, Plaintiff posted bond but was not released because of an immigration detainer issued on January 10, 2023, by ICE to the Tangipahoa Sheriff's Office. The detainer was issued after being alerted by the Tangipahoa Parish Sheriff's Office that they arrested a "Jose Rodriguez," a pseudonym for Jose Rodrigues-Leiva, an ICE fugitive from Honduras who had the same date of birth as Plaintiff.[2] Though the detainer

---

[1] Plaintiff is a United States citizen born in Texas. Doc 41-3.
[2] The Tangipahoa Parish Sheriff's Office sent National Crime Information Center information for Jose Efre Rodriguez-Leiva also known as "Jose Rodriguez." Doc. 28-2 at ¶3; Doc. 57-1 at 10.

requested that the Sheriff's Office hold "Mr. Jose Rodrigues-Leiva," an individual not in their custody, for an additional 48 hours beyond when he would otherwise be released, Tangipahoa Sheriff's Office held Plaintiff instead until January 13, 2023 because of this mistaken identification. The Sheriff's Office released Plaintiff only after his attorney sent a letter to Warden Heath Martin on January 13, 2023 that demanded his release and enclosed a copy of his birth certificate. The letter also indicated that Plaintiff's attorney spoke with a deputy at the Tangipahoa Jail on January 12, 2023, who informed him that even though the "ICE HOLD" had ended on January 11, 2023, Plaintiff was still in custody.[3] Plaintiff claims that during his time in custody, he provided the employees at the Tangipahoa Jail with his Texas drivers license and his social security number, and informed them on multiple occasions that he was a United States citizen.[4]

On December 19, 2023, Plaintiff brought claims under 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendments and for false imprisonment under Louisiana law against Defendants Tangipahoa Parish Jail ("TPJ"), Tangipahoa Sheriff's Office, Daniel Edwards in his official capacity as Sheriff of Tangipahoa Parish ("the Sheriff"), and Heath Martin in his official capacity as Warden of Tangipahoa Parish Jail ("the Warden").[5] On June 27, 2024, the Court dismissed with prejudice Plaintiff's claims against Defendants TPJ and Tangipahoa Sheriff's Office.[6] In his First Amended Complaint, Plaintiff added false imprisonment and negligence claims against Defendants ICE, immigration officer Mayo K. Bonnet, and the United States under the Federal Tort Claims Act ("FTCA").[7] On July 15, 2025, the Court

[3] Doc. 55-8.
[4] Doc. 41 at 2.
[5] Doc. 1.
[6] Doc. 9.
[7] Doc. 14.

dismissed the FTCA claims against Defendants ICE and Bonnet as procedurally improper.[8] Plaintiff has since settled the FTCA claims with the United States.[9] What remains in Plaintiff's Second Amended Complaint are § 1983 *Monell* claims against the Sheriff and Warden in their official capacities for violation of his Fourth and Fourteenth Amendment rights as well as state law claims for false imprisonment.

Defendants move for summary judgment on the § 1983 *Monell* claims against the Sheriff and on all claims against the Warden. Defendants do not seek summary judgment on the state law false imprisonment claim against the Sheriff. Plaintiff opposes.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[10] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[11]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[12] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts

[8] Doc. 40.
[9] Doc. 62.
[10] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[11] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[12] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).

showing the existence of a genuine issue for trial."[13] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[14] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[15] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[16] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[17]

## LAW AND ANALYSIS

Plaintiff brings state law and § 1983 *Monell* claims on the grounds that: (1) the Sheriff and Warden had an unconstitutional policy or custom of honoring all immigration detainers; and (2) the Sheriff and Warden failed to adequately train their employees on how to handle ICE detainers. Plaintiff's state law claim is for false imprisonment and is based on a theory of vicarious liability under Louisiana Civil Code article 2320.

Defendant has moved for summary judgment on all claims against the Warden and only the § 1983 claims against the Sheriff, arguing that the claims against the Warden are redundant and that the Plaintiff cannot show the

---

[13] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[14] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[15] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[16] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[17] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

Sheriff's Office had an unconstitutional policy or custom, or that the Sheriff failed to adequately train his employees. The Court will address the dismissal of all claims against the Warden before addressing Plaintiff's *Monell* claims against the Sheriff.

## I. Claims Against the Warden

Defendant argues that the claims against the Warden, both state and federal, are duplicative of those against the Sheriff because a municipal official sued in his official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent."[18] They contend that, when sued in their official capacity, the Warden and Sheriff represent the same entity: the Tangipahoa Sheriff's Office. However, they say the claims against the Warden are duplicative of those against the Sheriff because it is the Sheriff who properly represents both the Sheriff's Office and TPJ when sued in his official capacity. This Court agrees.

The Court finds that the § 1983 *Monell* claims against the Warden must be dismissed because "[t]he Sheriff in his official capacity is the appropriate governmental entity responsible for any constitutional violations committed by his office."[19] And, under Louisiana Revised Statues § 15:704, the "administration of a parish jail … is the province of the Sheriff of the parish,"[20] making "Sheriffs in Louisiana [the] final policy makers with respect to

---

[18] Kentucky v. Graham, 473 U.S. 159, 166 (1985) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).

[19] Jones v. St. Tammany Par. Jail, 4 F. Supp. 2d 606, 614 (E.D. La. May 8, 1998) (citing Jenkins v. Jefferson Par. Sheriff's Off., 402 So.2d 669, 670 (La. 1981); Burge v. Par. of St. Tammany, No. 91-2321, 1997 WL 10243, at * 18 (E.D. La. Jan. 8, 1997); and Craig v. St. Martin Par. Sheriff, 861 F. Supp. 1290, 1301 (W.D. La. Aug. 22, 1994)).

[20] Oladipupo v. Austin, 104 F. Supp. 2d 654, 661 (W.D. La. April 24, 2000) (citing LA. REV. STAT. § 15:704). Specifically, § 15:704 reads, "[e]ach sheriff shall be the keeper of the public jail of his parish, and shall by all lawful means preserve the peace and apprehend all disturbers thereof, and other public offenders."

management of the jail."[21] Thus, the *Monell* claims against the Warden are redundant and must be dismissed.[22]

Plaintiff's false imprisonment claim is based on a theory of vicarious liability under Louisiana Civil Code article 2320. But "[u]nlike with regard to § 1983 actions, '[m] unicipalities do not enjoy special protection from vicarious liability under Louisiana law and are subject to *respondeat superior* like every other employer."[23] Specifically, under article 2320 "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." Courts have made clear that it is "[t]he sheriff, in his official capacity, [that] is the proper party to sue for the torts of his employees."[24] Because the alleged torts here were committed by employees of the Sheriff, he is the proper party to bring a claim for vicarious liability under article 2320.[25] Accordingly, the Court finds that Plaintiff's state law false imprisonment claim against the Warden must also

[21] Belcher v. Lopinto, 492 F. Supp. 3d 636, 649 (E.D. La. Oct. 5, 2020) (quoting *Jones*, 4 F. Supp. 2d at 613 (citing LA. CONST. ART. 5 § 27)).
[22] *See e.g.*, Broussard v. Lafayette City-Par. Consol. Gov't, 45 F. Supp. 3d 553, 571 (W.D. La. Sept. 5, 2014) (dismissing several defendants sued in their official capacity as redundant) (citing Castro Romero v. Becken, 256 F.3d 349, 355 (5th Cir. 2001) (same); Flores v. Cameron Cnty., 92 F.3d 258, 261 (5th Cir. 1996)).
[23] Elphage v. Gautreaux, 969 F. Supp. 2d 493, 517 (M.D. La. Sept. 3, 2013) (quoting Deville v. Marcantel, 567 F.3d 156, 173–74 (5th Cir. 2009) (citing Brasseaux v. Town of Mamou, 752 So.2d 815, 820 (La. 2000)).
[24] Addington v. Bayou Dorcheat Corr. Ctr., 595 F. Supp. 3d 538, 558 (W.D. La. Mar. 31, 2022), *rev'd on other grounds*, No. 22-30220, 2023 WL 2808466 (5th Cir. 2023) (citing Grafton v. Bailey, No. CV 13-2940, 2018 WL 2325410, at *13 (W.D. La. May 22, 2018) and Jenkins v. Jefferson Par. Sheriff's Off., 402 So. 2d 669, 669 (La. 1981)); *Jenkins*, 402 So. 2d at 671 ("the sheriff is the appropriate governmental entity on which to place responsibility for the torts of a deputy sheriff"); *Grafton*, 2018 WL 2325410 at *13 (citing LA. REV. STAT. § 42.1441.3(E) and stating that "[t]he sheriff, in his official capacity, is the proper party to sue for the torts of his employees.").
[25] *See* Salvagio v. Doe, No. 13-5182, 2013 WL 6623921, at *3 (E.D. La. Dec. 16, 2013) ("The sheriff's office, not the parish, controls the inmates of the jail, the employees of the jail, and the daily management and operation of the jail.") (citing LA. REV. STAT. §§ 33:1435; 15:704; and O'Quinn v. Manuel, 773 F.2d 605, 609 (5th Cir. 1985)).

be dismissed. The Court now turns to Plaintiff's *Monell* claims against the Sheriff.

## II. *Monell* Claims Against the Sheriff

Plaintiff claims that the Sheriff had an unconstitutional policy or custom of "treating an ICE request as controlling" and "continu[ed] detention until ICE acted or senior Jail personnel intervened."[26] Section 1983 authorizes suits for damages against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[27] "In *Monell*, the Supreme Court held that a governmental entity is liable under § 1983 only when the entity itself caused the constitutional violation at issue."[28] To prevail on a *Monell* claim, the plaintiff must show: "(1) an official policy [or custom] (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."[29]

### A. Policy or Custom

Because Defendants have conceded that the Sheriff was the policymaker here, the Court considers whether an official policy or custom was the moving force behind Plaintiff's alleged constitutional violations. The alleged policy or custom at issue is whether the Sheriff treated ICE detainers as controlling and continued to detain individuals until ICE or senior TPJ personnel intervened, regardless of what information was subsequently learned.

---

[26] Doc. 56 at 2.

[27] 42 U.S.C. § 1983.

[28] Moses v. City of New Orleans, No. 24-1768, 2025 WL 816296, at *5 (quoting *Monell*, 436 U.S. at 694).

[29] Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir. 2009) (citation omitted).

A plaintiff can establish a policy, practice, or custom in multiple ways. One way is to show that there is a policy "that is 'officially adopted and promulgated' by the municipality or an official within the municipality with policymaking authority."[30] An "[o]fficial policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations."[31] An alternative way is to show that there is a "persistent, widespread practice of city officials or employees, which, although not authorized by officially promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[32] Such a practice "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."[33] Indeed, this "pattern of abuses" must "transcend[] the error made in a single case."[34] Thus, showing a custom "requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."[35] "[I]solated unconstitutional actions by municipal employees will almost never trigger liability."[36] Further, "[a] policymaker with policy-making authority must have actual or constructive knowledge of the custom."[37]

---

[30] Flanks v. City of New Orleans, No. CV 23-6897, 2025 WL 660037, at *8 (E.D. La. Feb. 28, 2025) (citing Burge v. St. Tammany Par. (*Burge II*), 336 F.3d 452, 471 (5th Cir. 1999) (quoting City of Canton v. Harris, 489 U.S. 378, 380 (1989)).
[31] Piotrowski v. City of Houston, 237 F.3d 567, 579 (5th Cir. 2001).
[32] *Flanks*, 2025 WL 660037, at *8 (citing *Burge II*, 336 F.3d at 471 (quoting *City of Canton*, 489 U.S. at 380).
[33] *Peterson*, 588 F.3d at 850 (quoting Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir. 1984)).
[34] *Id.* at 851 (quoting *Piotrowski*, 237 F.3d at 582).
[35] Benfer v. City of Baytown, 120 F.4th 1272, 1286 (5th Cir. 2024) (quoting Hicks-Fields v. Harris Cnty., 860 F.3d 803, 810 (5th Cir. 2017)).
[36] *Piotrowski*, 237 F.3d at 578 (citing Bennett v City of Slidell, 728 F.2d 762, 768 n.3 (5th Cir. 1984) and McKee v. City of Rockwall, 877 F.2d 409, 415 (5th Cir. 1989)).
[37] *Flanks*, 2025 WL 660037, at *8 (citing *Webster*, 735 F.2d at 842).

Defendant argues that "Plaintiff cannot establish a policy or custom that was the moving force behind the alleged constitutional violation at issue."[38] Defendant points out that the Sheriff's official, written policies—contained in the Tangipahoa Parish Jail Booking Guide and its Training Policy[39]—in no way direct "TPJ staff to hold inmates longer than legally permissible pursuant to an ICE detainer or to disregard claims of mistaken identity."[40] Defendant says that these policies require the opposite, noting that the Booking Guide "requires personnel to verify identifying information and compare records through those identities specifically to *avoid* cases of mistaken identity."[41]

Aside from its official policies, Defendant argues that Plaintiff cannot create a genuine issue as to whether the Sheriff had "an unconstitutional custom or practice of … holding inmates longer than legally permissible pursuant to an ICE detainer."[42] Defendant says the record shows Plaintiff has never been held on an ICE detainer before[43] and that there is no evidence of similar ICE detainer lawsuits or substantiated complaints within the past five years.[44] Defendant says it is notable that "when Plaintiff's former counsel sent a letter to Warden Martin, the highest ranking employee at TPJ charged with enforcing the Sheriff's policies, Plaintiff was released the same day."[45]

---

[38] Doc. 55-1 at 5.
[39] Doc. 55-9; Doc. 55-10.
[40] Doc. 55-1 at 5.
[41] *Id.* (emphasis in original). The Booking Guide directs staff to "[c]heck to see if all paperwork is present and properly filled out" when starting the booking process. Doc. 55-9 at 2. It also tells staff to "[c]heck all like names and compare information (i.e., Date of birth, race, sex, social security number). *Id.* at 3. It further admonishes staff that "[t]he more information that you can obtain prevents confusion and mistaken identification." *Id.*
[42] Doc. 55-1 at 5–6.
[43] Plaintiff's deposition testimony states that he has never had an ICE detainer placed on him before. Doc. 55-11 at 3.
[44] Doc. 55-12 at 2–3.
[45] Doc. 55-1 at 7.

In Opposition, Plaintiff argues that the evidence creates a genuine issue as to the Sheriff's actual policy or procedure, regardless of what its written policies say.[46] On Plaintiff's undisputed version of the facts, which this Court takes as true, Plaintiff informed six employees that he was an American citizen born in Houston—yet none investigated his claim. Moreover, his family contacted the jail multiple times after his bond was posted on January 9, 2023, to explain he was an American citizen who should not be placed on an immigration hold. Plaintiff says his counsel spoke with a Deputy on January 12, 2023, who acknowledged that the hold ended the day prior. Counsel then sent a formal letter containing his Texas birth certificate, yet Plaintiff remained confined. On January 13, 2023, Plaintiff's counsel next spoke with a lieutenant who confirmed that Plaintiff posted bond on January 9, 2023, and that the immigration hold expired on January 11, 2023. The lieutenant maintained, however, that Plaintiff would not be released because ICE had to retrieve him. It was not until Plaintiff's counsel sent another letter containing Plaintiff's birth certificate to the Warden on January 13, 2023, that he was finally released.

Plaintiff contends that the uniform behavior by the officers and the "conflict between Defendants' written-policy evidence and the conduct at issue" creates a genuine issue as to whether the Sheriff's unwritten policy "was to maintain custody whenever an ICE detainer appeared in its system, notwithstanding contrary identity information, claims of citizenship,

[46] Plaintiff's Opposition seems to abandon the claim in his Complaint that the Sheriff had a "written policy directive which directs officers to extend a person's detention whenever there is an ICE hold in place." Doc. 41 at 18. Instead, Plaintiff argues that the conflict between the written policies and the officers' actions creates a genuine issue as to whether the unofficial practice or procedure was to unlawfully hold individuals subject to immigration detainers. The Court addresses Plaintiff's claims as argued in his Opposition.

expiration of the 48-hour period, or absence of any response from ICE."[47] This Court disagrees.

The Court finds that Plaintiff has failed to meet his "heavy burden"[48] of identifying a "persistent, widespread practice of city officials or employees" detaining individuals until ICE or senior TPJ personal intervened.[49] The law is clear, "[a] municipality is almost *never* liable for an *isolated* unconstitutional act on the part of an employee."[50] A pattern or custom "requires similarity and specificity."[51] Plaintiff must prove "the existence of a custom by showing 'a pattern of abuses that transcends the error made in a *single case*.'"[52] Plaintiff fails to do so here. Specifically, Plaintiff identifies no similar detainer lawsuits or substantiated complaints within the past five years.[53] Instead, the entirety

[47] Doc. 56 at 8. Plaintiff points out in his Response to Defendants' Statement of Uncontested Facts that TPJ's Booking Guide has a "written ten-business-day provision" that allows an agency to retrieve an individual subject to a detainer for up to ten days. Doc. 56-1 at 3 ¶7. Plaintiff claims this creates a genuine issue of whether this *written* policy caused or prolonged his detention. *Id.* The Court notes that Plaintiff spent the entirety of his Opposition arguing that his continued detention *conflicts* with TPJ's written policies only to contradict himself in his Response to Defendants' Statement of Uncontested Facts. Even still, Plaintiff's argument is without merit because the provision does not *require* TPJ staff to hold individuals subject to detainers for ten days, nor does it allow them to ignore identifying information. As Defendants point out, the guide instructs staff to review paperwork and to check "[d]ate of birth, race, sex, social security number" during the booking process. Doc. 55-9 at 1–3.

[48] *Benfer*, 120 F.4th at 1286 ("Showing a pervasive pattern is a heavy burden." (quoting Sanchez v. Young Cnty., 956 F.3d 785, 793 (5th Cir. 2020)).

[49] *Flanks*, 2025 WL 660037, at *8 (citing *Burge II*, 336 F.3d at 471 (quoting *City of Canton*, 489 U.S. at 380).

[50] *Peterson*, 588 F.3d at 847 (quoting *Piotrowski,* 237 F.3d at 578) (emphasis added); *see also Bennett*, 728 F.2d at 768 n.3 (en banc) ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy.") (citation omitted).

[51] *Benfer*, 120 F.4th at 1286 (citation omitted).

[52] *Id.* (quoting *Piotrowski*, 237 F.3d at 582) (emphasis added).

[53] Plaintiff misunderstands the burden of proof when he argues that "Defendants' reliance on the absence of prior lawsuits" or lack of "substantiated complaints" fails to establish that *no* prior mistakes occurred. Doc. 56 at 12. It is Plaintiff that has the burden of establishing a pattern of past incidents, and the absence of evidence in that regard negates proof of an essential element in his case. *Peterson*, 588 F.3d at 851 n.4 (noting that the burden of showing

of Plaintiff's claim is based upon isolated acts of TPJ employees confined to this single case.[54]

The Court finds *Benfer v. City of Baytown, Texas* instructive.[55] In *Benfer*, the plaintiff alleged that the city had a custom of allowing police officers to use police dogs unconstitutionally.[56] The Fifth Circuit held, at the motion to dismiss stage, that five incidents of excessive force in the past four years was insufficient to meet the "heavy burden" of showing an unconstitutional custom.[57] Thus, the court upheld dismissal of the plaintiff's claim that the city "had inadequate written policies concerning the use of police dogs or had a pattern/custom of using police dogs to inflict injuries on non-threatening suspects."[58] If five incidents cannot survive the motion to dismiss stage, zero incidents certainly cannot survive the summary judgment stage.

Moreover, even if the Court assumed Plaintiff could establish an unconstitutional custom or practice, he offers no evidence that the Sheriff had actual or constructive knowledge of it. When asked whether he ever met the Sheriff, he said he did not know.[59] And there is no other evidence in the record demonstrating that the Sheriff knew or should have known of an allegedly unconstitutional custom or practice. "When the nonmovant fails to make a sufficient showing on an essential element of [his] case, the moving party is entitled to summary judgment 'since a complete failure of proof concerning an

---

a municipal policy of using or condoning excessive force is on the plaintiff); *Benfer*, 120 F.4th at 1286 (describing plaintiff's burden of showing a pattern as "heavy").

[54] Plaintiff also seems to argue that TPJ "had no effective procedure for challenging or terminating an ICE hold" based upon multiple employees failing to investigate his claim. Doc. 56 at 10. If this were true, however, Plaintiff's argument would concede that TPJ did not have an unconstitutional policy of holding individuals on ICE detainers because a policy cannot be unconstitutional if it does not exist. Thus, this argument is meritless.

[55] 120 F.4th 1272.

[56] *Id.*

[57] *Id.* at 1286 (citing *Sanchez*, 956 F.3d at 793).

[58] *Id.*

[59] Doc. 55-11 at 2.

essential element of the nonmoving party's case necessarily renders all other facts immaterial.'"[60]

To be sure, Plaintiff has likely created a genuine issue as to whether his constitutional rights were in fact violated.[61] But that is not the issue here. The issue here is whether that violation is attributable to a policy or custom of the Sheriff. The Court concludes that it is not. Accordingly, Plaintiff's policy or custom claim must be dismissed.

**B. Failure to Train**

Plaintiff also claims that the Sheriff failed to adequately train his employees on how to respond to an ICE detainer request. Specifically, Plaintiff alleges that the Sheriff "does not train its officers on how to evaluate or respond to information indicating that the target of an ICE Detainer is a U.S. citizen or otherwise not subject to removal."[62] "A municipality may also incur § 1983 liability for its non-policy-making employees' acts when a municipal policy of hiring or training causes those acts."[63] To succeed on such a claim, Plaintiff

---

[60] *McKee*, 877 F.2d at 414–15 (quoting Celotex Corp., 477 U.S. at 323).

[61] Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures was likely violated. The Defendants' Motion largely assumes as much and there is no dispute that Plaintiff was held in custody after posting bond based on the erroneous issuance of an immigration detainer. "Because [Plaintiff] was kept in custody for a new purpose after [he] was entitled to release, [he] was subjected to a new seizure for Fourt Amendment purposes—one that must be supported by a new probable cause justification." Morales v. Chadbourne, 793 F.3d 208, 217 (1st Cir. 2015) (citing Illinois v. Caballes, 543 U.S. 405, 407–08 (2005) and Arizona v. United States, 567 U.S. 387, 413 (2012)); *see also* Cervantez v. Whitfield, 776 F.3d 556, 560 (5th Cir. 1985) (stating that in immigration hold is an *arrest* and may only be authorized "when the officer has determined that there is probable cause to believe that the person to be held (a) is an alien, (b) is in the United States in violation of the immigration laws, and (c) is likely to escape before a warrant can be obtained for his arrest"). Thus, for the purposes of this Motion the Court concludes that, as an American citizen, there was not probable cause to hold Plaintiff on an immigration detainer in violation of his Fourth Amendment rights.

[62] Doc. 41 at 18.

[63] *Broussard*, 45 F. Supp. 3d at 572 (citing Benavides v. Cnty. of Wilson, 955 F.2d 968, 972 (5th Cir. 1992); Zarnow v. City of Wichita Falls, 614 F.3d 161, 170 (5th Cir. 2010)).

"must show that (1) the training or hiring procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and (3) the inadequate hiring or training policy directly caused the plaintiff's injury."[64] A municipality will act with "deliberate indifference" if, considering the "duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."[65]

Defendant argues that Plaintiff cannot satisfy his burden to show a failure to train. Defendant contends that there "is no evidence of any pattern of comparable ICE detainer incidents and the written booking and training materials establish that procedures and training existed."[66] Therefore, Defendant says, Plaintiff cannot show deliberate indifference. Moreover, Defendant argues that *Monell* liability for failure to train "cannot rest on the single incident at issue,"[67] relying on *Peterson v. City of Forth Worth, Texas*, to argue that "Plaintiff cannot convert an alleged isolated detention error into official capacity liability for the Sheriff."[68]

In *Peterson*, the plaintiff brought a failure to train claim against the City of Fort Worth after he was injured from knee strikes during an arrest.[69] The Fifth Circuit concluded that the plaintiff had failed to present a "material fact question" as to whether the City was deliberately indifferent "to the obvious

---

[64] *Id.*
[65] *Id.* (citing *Benavides*, 955 F.2d at 972); *see also Flanks*, 2025 WL 660037, at *7 ("Court of Appeals have routinely equated deliberate indifference with recklessness." (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994) (collecting cases)).
[66] Doc. 55-1 at 8.
[67] *Id.*
[68] 588 F.3d 838; Doc. 55-1 at 9.
[69] 588 F.3d 838.

need for training on the risk of injuries from knee strikes."[70] The court reasoned that, while "[t]he failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights," plaintiff pointed "to no evidence that the City was aware of any risk of injury from knee strikes, and the City showed that officers otherwise go through extensive training on the use of force."[71] Because there was "the absence of evidence that the use of knee strikes had caused serious injuries on previous occasions," there was no material question of fact showing "that it should have been *obvious* to the policymakers that the risk of serious injury was a 'highly predictable consequence' of the failure to train."[72]

Plaintiff argues that the Sheriff's Office training on how to deal with ICE detainers was insufficient. Plaintiff contends that "[a] policy calling generally for training, legal updates, and remedial instruction does not prove that the employees involved received relevant training or that the training taught lawful processing of ICE detainers."[73] Plaintiff says that the record reflects that "TPJ employees did not know or did not follow the 48-hour limit; did not know how to address a claim of United States citizenship; did not compare the detainer's full identity information with Plaintiff's documents; and did not have an effective procedure for contacting ICE or escalating the discrepancy."[74] According to Plaintiff, the "sufficiency and implementation of [TPJ's] training … remain[s] disputed."[75] This Court disagrees.

---

[70] *Id*. at 849.
[71] *Id*.
[72] *Id*. (citing Estate of Davis ex rel. McCully v. City of N. Richmond Hills, 406 F.3d 375, 383, 386 (5th Cir. 2005)) (emphasis in original).
[73] Doc. 56 at 12.
[74] *Id*.
[75] *Id*.

The Court finds that, like *Peterson*, Plaintiff has failed to raise a genuine issue as to whether the Sheriff is liable for a failure to train his employees. The Court notes that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[76] Showing deliberate indifference requires policymakers have "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights" and they still "choose to retain that program."[77] This is why "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[78]

Far from making such a demonstration, Plaintiff does not dispute that the TPJ Booking Guide "directs personnel to compare stable identifiers, including date of birth, race, sex, and Social Security number, and explains that complete information prevents mistaken identification."[79] Nor does Plaintiff dispute that the Sheriff's "written training policy generally requires training, legal updates, policy reviews, and remedial training … attendance records and detailed course files, including lesson plans, participant names, examinations, and test scores."[80] In essence, Plaintiff's argument is that while TPJ trained its employees, its training was not good enough. The Court finds that this argument, coupled with the fact that Plaintiff has pointed to no prior constitutional violations, falls woefully short of showing that the Sheriff's training program "was so clearly inadequate as to be obviously likely to result in a constitutional violation."[81] Indeed, "there is a difference between

---

[76] Connick v. Thompson, 563 U.S. 51, 61 (2011) (citation omitted).
[77] *Id.* (citing Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407 (1997)).
[78] *Id.* at 62 (citing *Bryan Cnty.*, 520 U.S. at 409).
[79] Doc 56-1 at 6 ¶26 (citing Doc. 55-9 at 3).
[80] Doc 56-1 at 4 ¶9 (citing Doc. 55-10 at 1–4, 7–8).
[81] Burge v. St. Tammany Par., 336 F.3d 363, 370 (5th Cir. 2003) ("deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising

a *complete failure to train* … and a failure to train in one limited area."[82] Mindful of its obligation to avoid "second-guessing municipal employee-training programs," an "exercise … federal courts are ill suited to undertake," the Court finds that Plaintiff's failure to train claim must be dismissed.[83]

**CONCLUSION**

For the foregoing reasons;

**IT IS ORDERED** that Defendants' Partial Motion for Summary Judgment is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's § 1983 claims against Defendant Daniel Edwards in his official capacity and Defendant Heath Martin in his official capacity are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff's state law false imprisonment claim against Defendant Heath Martin in his official capacity is **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana this 27th day of October, 2026

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation'" (quoting Thompson v. Upshur Cnty., 245 F.3d 447, 459 (5th Cir.2001)); *see also Benfer*, 120 F.4th at 1287 (finding that the plaintiff "made no attempt to identify a specific training program, point out particular deficiencies in that program, or explain why any lack of a formalized training program was constitutionally problematic" (quoting *Zarnow*, 614 F.3d at 170)).

[82] *Estate of Davis*, 406 F.3d at 386 (citation omitted and emphasis in original).

[83] *City of Canton*, 489 U.S. at 392 (citation omitted).